FILED
2011 Sep-30  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| **BETH BREWER,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ]     **CV-09-BE-0153-M** |
| | ] |
| **HARTFORD LIFE & ACCIDENT** | ] |
| **INSURANCE COMPANY,** | ] |
| | ] |
| **Defendant.** | ] |

**<u>MEMORANDUM OPINION</u>**

## I. INTRODUCTION

This ERISA long-term disability benefits matter comes before the court for judgment on the pleadings upon the following motions: "Plaintiff's Motion for Summary Judgment" (doc. 24); "Motion for Summary Judgment by Hartford Life and Accident Insurance Company" (doc. 27); and "Defendant's Motion to Strike Exhibit Submitted in Support of Plaintiff's Summary Judgment Reply Brief" (doc. 38). After the parties fully briefed the cross motions for summary judgment, the court granted the parties' joint motion for submission of the case for judgment on the Record, in lieu of a bench trial (doc. 40). Consequently, the court has reviewed the parties' submissions as the trier of fact and now reaches a final decision on the merits.

Plaintiff Beth Brewer seeks judgment in her favor on the claim that Defendant Hartford wrongfully terminated her long-term disability benefits and that she is entitled to receive those benefits. Hartford, which acquired the insurer that issued Plaintiff's disability insurance policy, argues that its decision to terminate Ms. Brewer's benefits was correct because the cumulative

evidence in the claims file no longer supports a finding of "Disability" under the terms of its policy.

The court has carefully considered the parties' arguments and evidentiary submissions, the Administrative Record, and the applicable law.  For the reasons stated below, the court grants Hartford's motion to strike and motion for summary judgment, converted to a motion for judgment on the record and denies Ms. Brewer's motion for summary judgment, also converted to a motion for judgment on the record.

## II. STATEMENT OF FACTS

*The Policy*

Ms. Brewer worked for the Tom McLeod Software Corporation. While employed by McLeod, she was covered under by a group long term disability contract of insurance ("the plan") issued by Continental Casualty Company ("CCC").  The plan defined "Total Disability" for purposes of Ms. Brewer's eligibility for disability benefits and stated as follows:

> **HOW DO WE DEFINE DISABILITY?**
> Disability or Disabled means that You satisfy the Occupation Qualifier or the Earnings Qualifier as defined below:
>
> **Occupation Qualifier**
> "Disability" means that during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
> (1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
> (2) not working for wages in any occupation for which You are or become qualified by education, training or experience.
>
> After the Monthly Benefit has been payable for 24 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
> (1) continuously unable to engage in any occupation for which You are or become

2

qualified by education, training or experience, and
(2) not working for wages in any occupation for which You are or become qualified by education, training or experience.

**Earnings Qualifier**
You may be considered to be Disabled during and after the Elimination Period in any Month in which You are Gainfully Employed, if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that You are unable to earn more than 60% of Your Monthly Earnings in any occupation for which You are qualified by education, training or experience.   On each anniversary of Your Disability, We will increase your Monthly Earnings by the lesser of the current annual percentage increase in CPI-W, or 10%.

(A.R. at 119).[1]

The plan also included a provision requiring participants to provide ongoing proof of

disability:

**Proof of Disability**

The following items, supplied at Your expense, must be a part of Your proof of loss. Failure to do so may delay, suspend, or terminate Your benefits:
...
4.     Proof that you are receiving Appropriate and Regular Care for Your condition from a Doctor, who is someone other than You or a member of Your immediate family, whose specialty or expertise is the most appropriate for Your disabling condition(s) according to Generally Accepted Medical Practice.

5.    Objective medical findings which support Your Disability**.** Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for Your disabling conditions(s).

6.    The extent of Your disability, including restrictions and limitations which are preventing You from performing Your Regular Occupation.

(A.R. at 126).

In short, the plan states that during the first two years a participant is disabled if her injury

---

[1] Citations to the Administrative Record (doc. 29 and doc. 30) are indicated with "A.R." followed by the page number.

prevents her from working in her former job and she is not working any other jobs. After two years, a participant must show that she is unable to work any job for which she is qualified and that pays more than 60% of the base pay from her former job. The plan places the burden on the claimant of proving disability by objective medical evidence.

CCC administered the plan until December, 2003. After Hartford acquired CCC, Hartford began administering claims made under the LTD Policy starting from January 2004.

*Ms. Brewer's Initial Claim*

Ms. Brewer worked for McLeod Software as an account manager when she ceased work in April 2001 because of back problems. Specifically, Ms. Brewer was diagnosed with lumbar spondylosis and low back pain.  In January and April 2001, Dr. Andrade, neurosurgeon, performed two back surgeries on Ms. Brewer. Following the surgeries Dr. Andrade diagnosed Ms. Brewer with post-laminectomy syndrome, also known as failed back syndrome.

Hartford awarded Ms. Brewer LTD benefits on August 14, 2001 for a closed period of July 2001 to August 2001.  Hartford denied continuing "own occupation benefits" after this time based on an interview with Dr. Andrade, who felt that "excess medications" prevented Ms. Brewer from returning to work and that Ms. Brewer could sit, stand, and change positions as needed to perform her former job. (A.R. at 632–33).

In support of Ms. Brewer, Dr. Varley, her pain management physician, wrote to Hartford in November 2001 and shared his opinion that Ms. Brewer was unable to return to her job because of physical restriction and pain. Some of Ms. Brewer's other treating physicians at the time also wrote to Hartford explaining that Ms. Brewer was disabled and could not work. Hartford nevertheless upheld its "own occupation" termination decision on internal appeal on

November 15, 2001.  Hartford acknowledged that Ms. Brewer's physicians stated that she was unable to work, but explained that it was still denying her benefits because the physicians had not submitted evidence to support this assessment and because one of her other treating physicians disagreed and stated she could work.

Ms. Brewer then underwent a third back surgery in September, 2002. Dr. Cezayirli, who performed this surgery, wrote to Dr. Varley on November 27, 2002 and indicated that Ms. Brewer had done well with surgery and that her leg felt better, although she still complained of lower back pain.  Dr. Cezayirli added that Ms. Brewer had decreased her dosage of pain medication on her own and that "[s]he has done quite well." (A.R. at 467).  An MRI taken in October 2003, after the third surgery, revealed "no recurrent disc herniation, central canal or foraminal narrowing." (A.R. at 480).

*Ms. Brewer's first civil suit against Hartford*

Ms. Brewer then filed a lawsuit on March 12, 2003 under ERISA, seeking recovery of past benefits, future benefits, attorney's fees, interest, and costs.  Judge Propst resolved the lawsuit in Ms. Brewer's favor, with Ms. Brewer returning to "on-claim" status in June 2004. Specifically, Judge Propst found that Ms. Brewer had offered reasonable proof of disability and that Hartford had not proved by a preponderance of the evidence that its decision to terminate Ms. Brewer's benefits was not tainted by its conflict of interest.[2]

---

[2] This court notes, however, that this heightened arbitrary and capricious standard and burden-shifting, triggered upon a finding of conflict of interest, has since been modified by the Eleventh Circuit in response to the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). *See Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008) (explaining that *Glenn* implicitly overruled Eleventh Circuit precedent requiring district courts to review benefit determinations by conflicted administrators under the heightened standard, and that instead the conflict should only be taken into account when conducting the arbitrary and capricious analysis, with the burden remaining on the plaintiff to show that the decision was arbitrary).

*Ms. Brewer's Medical Treatment after her First Lawsuit and Award of Social Security Disability Benefits*

On August 17, 2004, Ms. Brewer underwent an x-ray of her lumbar spine.  The test reflected her fusion: "[t]he lateral and the AP views show fusion from L3 through L4 and L5 to the first sacral segment.  Stabilizing plates and screws are well-positioned.  Spacer cages are noted in position.  Paraspinal soft tissues are normal.  The sacroiliac joints are unremarkable." (A.R. at 476). The radiologist commented that Ms. Brewer's scans reflected "[s]atisfactory post-operative appearance." (A.R. at 476).  Ms. Brewer also underwent an epidural block injection in September 2004 to help relieve her pain. (A.R. at 455).

On April 24, 2005, the Social Security Administration ("SSA") awarded Ms. Brewer Social Security Disability Benefits. The SSA determined that Ms. Brewer had been disabled as of April 11, 2001, and awarded her past benefits in addition to future benefits.

*Hartford's Temporary Termination and Reinstatement of Benefits*

In 2005, Ms. Brewer did not send Hartford any medical records in support of her claim. Hartford thus interrupted Brewer's benefits on July 31, 2006 because of Ms. Brewer's failure to provide proof of ongoing disability. Hartford's letter denying Ms. Brewer's benefits noted that Hartford had tried to contact her multiple times during 2006 to obtain information, and explained that she needed to submit a Claimant Questionnaire and an Attending Physician's Statement for Hartford to determine if she was "Disabled" under the plan.

Ms. Brewer responded by providing the requested documentation to Hartford, including a May 2006 Attending Physician's Statement from Dr. Columbia, a family medicine doctor with the Doleys Clinic Pain and Rehabilitation Institute, and a July 2006 Claimant Questionnaire. Dr. Columbia explained in her statement that Ms. Brewer had lumbar spondylosis and chronic lower

back pain, and that she saw her on a monthly basis, although the last surgery was in September, 2002. She also suggested that Ms. Brewer was restricted for "lifetime" to "30 minutes alternating of any activity." (A.R. at 388). Ms. Brewer self-reported that she could not lift and could not stand or sit longer than 20-30 minutes, and that her limitations varied day-to-day. Based on this evidence, Hartford determined that Ms. Brewer had medically supported her inability to work and reinstated her benefits.

*Treatment and Records in 2006-2007*

Throughout 2006 and 2007, Ms. Brewer primarily visited Dr. Columbia and Dr. Ryder, both pain medicine specialists.  In August 2006, Ms. Brewer reported to Dr. Columbia that, on an average day, she is up and active for four hours, sits for four hours and lies down for six hours, and described her average pain in the previous month as 6/10. Dr. Columbia prescribed Kadian, Provigil, Lyrica, Effexor and Zanaflex.  Dr. Columbia did not indicate that  Brewer had any side effects from her medications, but rather reported that she was "alert, awake and oriented [to] person, place, time and thing" and noted that Ms. Brewer walked with a single point cane.   Ms. Brewer also reported to Dr. Columbia that she went to the movies with her family, shopped and liked to cook.

Dr. Ryder appears to have taken over Ms. Brewer's care from Dr. Columbia in January 2007.  From his first office visit note on January 23, 2007, Dr. Ryder noted:

> The patient presents for continued assistance with chronic low back pain and left leg pain.  The patient reports current pain as 5/10 which is about average.  The highest pain level during the last 2 months is 7/10, the lowest pain in the last 2 months reported as 5/10.  The pain is described as a constant burning and aching in the lower back which has a shooting quality into the upper part of both legs but also all the way down the left leg.  The patient has no specific side effects from the medications.  She is fairly able to be out and away from home without too much pain.  On the whole she feels very happy with the quality of life she gets and with the quality of pain

7

control she has received.

(A.R. at 319).

On subsequent visits from March through August 2007, Ms. Brewer reported that she was "happy with the pain reduction she is getting" from her medications, and Dr. Ryder noted that Ms. Brewer experienced "no side effects from medication." (A.R. at 304).  In June 2007, she reported she was "up and active" for six to seven hours a day. (A.R. at 309).  She also reported participating in a pool program at her local gym a few times a week, and that her activities included reading, sewing, cleaning, fishing, and playing with her kids.  She further reported that her pain was well-controlled and that, overall, she was pleased with the quality of pain management. She carried a cane with her when seeing Dr. Ryder, although he noted that she often did not use it except to stand up from her seat.

*Hartford's Surveillance and In-Person Interview*

The record does not reflect that Ms. Brewer submitted medical documentation to Hartford during 2007. On August 23, 2007, John Gutierrez, an employee in Hartford's Special Investigations Unit ("SIU"), proactively reviewed Ms. Brewer's claim and accepted it for investigation. Gutierrez noted in the SIU file that the discrepancy between Ms. Brewer's self-reported severe limitations and the medical evidence in her case triggered Ms. Brewer's proactive review The SIU file further noted that Ms. Brewer's last procedure was in September 2002, and that a LexisNexis search showed a possible business associated with her address and telephone number.[3]

---

[3] Ms. Brewer later revealed that the business, Color for Gems, was an online jewelry business set up by her fiancée, and that she had nothing to do with the business.

Hartford proceeded with its review by hiring an investigator to conduct surveillance of Ms. Brewer on August 28 and August 29, 2007.  The investigator followed Ms. Brewer on those two days and produced a video that was recorded without her knowledge. The video shows Ms. Brewer driving, entering/exiting a vehicle, walking unassisted for extended periods, and going to the grocery store where she used both arms to reach the top shelf, and pushed a shopping cart. The video also showed Ms. Brewer bending, leaning, lifting two liter bottles, carrying groceries, and smoking.  At one point Ms. Brewer sat in her car for approximately twenty-five minutes and then later in the day for another twenty-four minutes, and stood and walked for approximately twenty-eight minutes. During the course of surveillance, Ms. Brewer never used a cane while walking or standing.  The video also showed Ms. Brewer pushing a shopping cart to her vehicle, raising the back hatch, lifting sacks from the cart, and placing them into the vehicle.

The investigator followed up his surveillance with a visit to Ms. Brewer's home on October 30, 2007, where he conducted an in-person interview with Ms. Brewer. The purpose of the interview, according to the investigator's notes, was to provide Ms. Brewer an opportunity to describe her level of functionality and to explain any inconsistencies between her self-reported limitations and her functionality on the video. The investigator showed Ms. Brewer the surveillance footage during the interview. When questioned about the footage, Ms. Brewer responded that she was capable of performing the activities documented on film and that it represented her normal/average level of functionality on a good day.  While speaking with Ms. Brewer, the investigator was also observing Ms. Brewer and noted the following:

- Brewer advised that she always uses a cane when she leaves the house and goes to the store . . .  Brewer did not use any special equipment, assistive devices, or braces in my presence.
- Brewer walked with a slow stride and a stable gait.  Brewer did not spontaneously

complain of difficulty or pain when walking and she did not display any objective signs of pain or difficulty when standing.

- Brewer sat on [a] cushioned dinette chair for approximately the first 40 minutes of the interview.
- Throughout the entire interview, Brewer did not spontaneously complain of pain in my presence. Brewer did not display any objective signs of the pain in my presence. Brewer never spontaneously complained of fatigue in my presence and she did not display any objective signs of fatigue in my presence. The claimant did state that she did not sleep well last night.
- Ms. Brewer was able to understand the directions and instructions provided during the interview.
- Ms. Brewer did not spontaneously complain of an inability to concentrate, confusion or lack of focus in my presence. Ms. Brewer did not display any objective signs of cognitive impairment, confusion, inability to concentrate, or lack of focus in my presence.
- Ms. Brewer was able to read and make changes to and sign her statement. She was able to rationalize reasons for her changes.

As part of the in-person interview, Ms. Brewer also provided, from her own perspective, her own statement of continuing disability. In summary, she described her medical condition, explained her own perceived limitations—for example, that she could only stand for 10-20 minutes before needing to sit down again—and discussed how her medical condition affected her day-to-day life. She also explained discrepancies between the video and her own self-reported limitations; for example, she said that although she normally needed a cane when outside the house, she did not need a cane when grocery shopping because she could lean on the shopping cart.

Hartford then sent a letter on November 15, 2007, to Dr. Ryder, Ms. Brewer's treating physician. Hartford opined in that letter that Ms. Brewer was "medically managed and remain[ed] essentially functional and independent" and "capable of performing in a full-time sedentary function . . . ." with certain restrictions and limitations. (A.R. at 273). To support its position, Hartford sent Dr. Ryder the video surveillance it had obtained and the report from the interview. The letter gave Dr. Ryder an opportunity to agree or disagree and provide his own

assessment of Ms. Brewer's functionality. Dr. Ryder did not respond, and remained unresponsive despite Hartford's additional attempts to contact him.

*Independent Records Review*

Hartford then sent Ms. Brewer's file to Dr. Sniger, board certified in physical medicine and rehabilitation and in spinal injury medicine, on December 5, 2007. Dr. Sniger reviewed the surveillance video and all of Ms. Brewer's medical records from August 2000 to August 2007.

He attempted to call Dr. Ryder three different times to discuss Ms. Brewer's file with him, and left voice mails when Dr. Ryder did not answer. Dr. Ryder never responded to the voice mails. Dr. Sniger noted that Ms. Brewer's last lumbar spine x-ray showed "satisfactory postop appearance" and that she had been on long-term opioid therapy "with good pain control and no side effects." (A.R. at 267). He concluded, from his review of the records, that Ms. Brewer would be able to perform full-time work with the restrictions of "occasional lifting up to 10 lbs., the opportunity to change positions as needed, no repetitive bending/twisting at the waist, [and] no squatting or kneeling." (A.R. at 368).

*Hartford's Employability Analysis*

On January 4, 2008, a Hartford vocational counselor performed an employability analysis for Ms. Brewer. The employability analysis took into account her functional capabilities, education, training, work history, geographic location, and the restrictions indicated by Dr. Sniger.  The counselor initially identified 124 jobs in the same or similar industries. She narrowed down the possibilities to three sample occupations that represented sedentary jobs in Ms. Brewer's local labor market: (1) computer security specialist; (2) computer processing scheduler; and (3) deposit refund clerk.

*Hartford's second denial of benefits*

Based on the results of the surveillance and interview, Dr. Sniger's review, and the employability analysis, Hartford denied Ms. Brewer's ongoing benefits. On January 17, 2008, SIU Analyst John Gutierrez sent a five-page letter to Ms. Brewer informing her of Hartford's decision to terminate her LTD benefits, effective as of January 18, 2008.  Gutierrez explained that Hartford, upon review of Ms. Brewer's claims for benefits, determined that she no longer met the definition of "Disability" under her employer's LTD policy.  Specifically, the letter states:

> We based our decision to terminate your claim based on policy language.  All documents contained in your file were reviewed as a whole.  This included, but was not limited to, the following information:
>
> • Claimant Questionnaire completed by you; dated 7/06/06;
> • Attending Physician's Statement completed by Dr. Columbia's office, dated 5/10/06;
> • Video Surveillance as requested from our representative vendor, Triad, conducted on 8/28/07 and 8/29/07 and reports;
> • Your Continuation of Disability Statement made on 10/3/07 to Hartford Investigator Gerard J. Tobin;
> • Updated medical information from Dr. Ryder;
> • Updated medical information from Dr. Columbia;
> • Claim review completed on 12/19/07 by a Hartford Medical Case Manager;
> • Independent Records Review completed by Dr. William Sniger on 12/18/07; and
> • Employment Analysis completed on 1/4/08 by a Hartford Rehabilitation Case Manager.
>
> Your claim file shows that you ceased working as an Account Manager on 4/11/01 due to Lumbosacral Spondylosis.  You have a history of back surgeries, with the most recent surgery occurring in September 2002.  You became eligible for LTD benefits on 7/10/01.  Your own occupation period was 24 months and paid through 7/9/03.  **In order to remain eligible for benefits as of 7/10/03 and beyond, it must be shown that you are prevented from continuously engaging in any occupation for which you are or become qualified by education, training, or experience.**

 (A.R 234 at 35) (emphasis added).

The letter further details the contents of the various documentation reviewed and Hartford's requests for updated medical information from Ms. Brewer's two treating physicians, Dr. Columbia and Dr. Ryder.  Specifically, Gutierrez informed Ms. Brewer that on November 15, 2007, Hartford sent its surveillance video and summary, as well as Tobin's interview information, to Dr. Ryder.  Gutierrez continues:

> As part of this correspondence, Dr. Ryder was advised that based on the totality of the medical evidence and other information offered and obtained, it was our assessment that your overall functional capabilities were at least equal to [those] which are required of you to perform in a full-time sedentary to light unskilled and skilled capacity.  **Dr. Ryder was advised that if he did not agree with this assessment, then he should provide restrictions and/or limitations with medical rationale as to why such restrictions and/or limitations were supported**.

(A.R. at 235–36) (emphasis added).  Gutierrez explains that because Hartford received "no response" from Dr. Ryder, it referred Ms. Brewer's file to an independent physician, Dr. Sniger, for an Independent Records Review on December 6, 2007, and that Dr. Sniger concluded she could work full-time subject to certain restrictions. (A.R. at 236).

The denial letter then explained that a Hartford Rehabilitation Case Manager had completed an Employment Analysis Report based on a review of all pertinent information in Ms. Brewer's file, and determined that she had "sufficient training, education, work history, and functional capabilities" to find at least three jobs meeting the minimum pay requirement in her area.  The letter notes that the suggested occupations in the analysis were merely examples and "do not necessarily represent all of the alternative occupations for which you may be qualified." (A.R. at 236).

The letter concluded:  "Based on all the information received to date, you no longer meet

13

the definition of Disability as defined by the Long Term Disability policy and your claim for Long Term Disability benefits has been terminated, effective 1/18/08." (A.R. at 236).  The letter then explained Ms. Brewer's right to appeal "and receive a full and fair review," providing an overview of the process and instructions on how and when to submit an appeal letter within 180 days. (A.R. at 236).

*The Appeals Process*

Ms. Brewer responded to Hartford's denial of benefits letter through her attorney on February 13, 2008, requesting an appeal of the denial decision and all documents and media related to Ms. Brewer's disability benefits. Hartford assigned Marsha Macko to handle Ms. Brewer's appeal.

Hartford initially shipped Ms. Brewer's file to the wrong address, although it appears to have rectified its mistake in April. On May 16, 2008, Hartford informed Ms. Brewer that she would have until July 23, 2008 to submit information in support of her appeal. Ms. Brewer did not submit any additional information in support of her appeal.

On August 7, 2008, Hartford informed her that it had not received any information and that it had determined that a comprehensive medical review, to be conducted by an independent physician, was necessary. In that letter, Hartford also advised Ms. Brewer that it had sent Dr. Ryder a letter that same day, and notified him that an independent physician would be contacting him to speak about Ms. Brewer. Hartford's separate letter to Dr. Ryder advised him that "his assistance in speaking with [the] consulting physician will help ensure a full and fair review of Ms. Brewer's claim" and that if the consulting physician could not speak with him, "[Hartford] would have no choice except to base [its] decision" on the current documentation. (A.R. at 201).

14

Hartford engaged Dr. Kounang, an independent and board certified physical medicine and rehabilitation doctor with a subspecialty in spinal cord injury medicine, to provide a peer review opinion on August 7, 2008. Dr. Kounang reviewed all of Ms. Brewer's submitted medical records and attempted to reach Dr. Ryder to discuss Ms. Brewer's condition on four separate occasions. Dr. Ryder never responded. Based on the medical records—and without Dr. Ryder's much-requested assistance—Dr. Kounang observed that although Ms. Brewer still had chronic back pain and failed back syndrome, and required large doses of medication for pain management, she still had the functional capacity to do light work, subject to certain restrictions. These restrictions were "occasional lifting of 20 lbs, frequent lifting of 10 lbs, walking and standing 2 hours in an 8 hour working period, and sitting for 6 hours in an 8 hour working period." (A.R. at 193).

With no additional medical records from Ms. Brewer, and with Dr. Kounang's review in the file, Hartford finally denied Ms. Brewer's benefits by letter dated September 16, 2008. The letter informed Ms. Brewer that Hartford had independently and thoroughly reviewed all of the evidence presented during the appeal, including Ms. Brewer's Social Security Award.[4] Hartford acknowledged Ms. Brewer's medical conditions, but explained that the presence of a condition, symptom, or treatment does not determine disability. Hartford emphasized that to be "Disabled," Ms. Brewer's condition had to be of such severity that she could not work in any job. While acknowledging that Ms. Brewer had her benefits reinstated by court order in 2004, Hartford

---

[4] Ms. Brewer emphasizes in her brief that Ms. Macko did not consider Judge Propst's order reinstating Ms. Brewer's benefits in 2004, nor did she review Judge Propst's Findings of Fact, even though Ms. Macko knew that the order existed. Ms. Brewer also emphasizes that Hartford never requested that Ms. Brewer attend an Independent Medical Examination ("IME") nor did Hartford request a Functional Assessment Test ("FAT").

explained that it had to base its decision on current medical findings; and that based on Dr. Ryder's most recent reports indicating improvements in Ms. Brewer's pain complaints, combined with the lack of other medical documentation, the reports of the independent medical consultants, and the surveillance, Hartford found its decision to deny LTD benefits after January 17, 2008, was proper. Finally, Hartford informed Ms. Brewer that she had exhausted her administrative remedies.

*Post-appeal*

Despite multiple attempts to contact Dr. Ryder during the initial review of Ms. Brewers' claim and during the appeals process, starting with a November 15, 2007 letter, Dr. Ryder did not contact Hartford until after the appeals process had terminated in September of 2008. On October 20, 2008, Hartford finally received a letter from Dr. Ryder where he stated that she would be unable to work in any useful capacity and would be a direct threat to herself and others. Hartford did not retain a copy of Dr. Ryder's letter in the administrative record because the appeals review had terminated.

## III. MOTION TO STRIKE

As an initial matter, the court addresses "Defendant's Motion to Strike Exhibit Submitted in Support of Plaintiff's Summary Judgment Reply Brief." (doc. 38).  Hartford seeks to strike a letter from Ms. Brewer's treating physician that it characterizes as after-acquired evidence precluded from the court's review.  Hartford rendered its decision terminating Ms. Brewer's LTD benefits on January 17, 2008, and affirmed its decision on September 16, 2008, after a lengthy appeal process.  The evidence now in dispute, a letter from Dr. Thomas Ryder dated October 16, 2008, thus post-dates the September 16, 2008 appeal determination by one month, and the initial

decision by eight months.  Ms. Brewer submitted a copy of Dr. Ryder's letter "for the record" as an attachment to her Reply Brief in support of her Motion for Summary Judgment.  (*See* Pl.'s Reply in Support of S.J., Doc. 35, Ex. A).

Hartford's Appeal Specialist, Marsha Macko, received Dr. Ryder's letter on October 20, 2008.  She promptly returned Dr. Ryder's letter to Brewer's counsel with a letter explaining

> The Hartford's final appeal decision was made on 09/16/08.  That decision was based on a complete and final review of claim file.  Therefore, the administrative remedies provided by ERISA and the policy have been exhausted.  There are no provisions for additional appeals or re-opening the claim file after a final appeal determination.
>
> In view of the fact that we have fully addressed Ms. Brewer's appeal, we are returning this information to you and will not be reviewing or providing a formal response to Dr. Ryder's 10/16/08 letter.

(A.R. 59 at 10).  Macko did not retain a copy of Dr. Ryder's letter in the claim file.

Ms. Brewer argues that in not receiving this letter into the Administrative Record after the appeal, Hartford breached a fiduciary duty.  Specifically, Ms. Brewer argues "[r]ather than strike a document submitted by an ERISA Plan beneficiary, the [c]ourt should find that it is unreasonable for a Plan fiduciary like Hartford to fail to retain documents it received, regardless of whether or not the fiduciary chose to rely on those documents."  (Pl.'s Opposition, Doc. 39, at 5.).  Ms. Brewer also argues that because Hartford's Appeal Specialist "received" the diagnosis letter from Dr. Ryder (as evidenced by her return of the letter and other notes in the claim file documenting receipt of the letter), it "is a *de facto* part of Plaintiff's administrative record" and cannot be stricken. As explained below, however, this court cannot consider the letter in reviewing the administrator's decision under Eleventh Circuit case law.

When a district court reviews a plan administrator's claim *de novo*, the district court is

limited to the Administrative Record as it existed <u>at the time the decision was made</u>.  *See Glazer v. Reliance Stand. Life Ins. Co.*, 524 F.3d 1241, 1246-47 (11th Cir. 2008) (explaining that a court performing a *de novo* review is "limited to the record that was before [the administrator] <u>when it made its decision</u>") (emphasis added); *Scippio v. Fla. Combined Life Ins. Co.*, 585 F. Supp. 2d 1317, 1328 (N.D. Fla. 2008) (citing *Glazer* and stating that "[i]f the administrator had discretion, the Court may <u>only consider the evidence the administrator was aware of at the time [of] the decision</u> when determining whether the decision was *de novo* wrong") (emphasis added).  The Eleventh Circuit has recently confirmed, albeit in an unpublished decision, that a court conducting *de novo* review is limited to the materials contained in the Administrative Record at the time of the denial of benefits decision.  *Ruple v. Hartford Life and Accident Ins. Co.*, 340 Fed. Appx. 604, 612 (11th Cir. 2008) ("Our law is clear, however, that even under the first step of the [*Williams*] analysis, where the court determines whether the administrator was wrong under a 'de novo' standard, '[w]e are limited to the record that was before [the administrator] when it made its decision.").  Although *Ruple* and the other unpublished cases that Hartford cites are not binding authorities, they are nevertheless persuasive.

Under the clear standard described in *Glazer* and *Ruple*, the court is limited to the material that was in front of the administrator at the time it made its decision to deny benefits. In a similar ERISA case before this court, the court denied the plaintiff's motion to amend the supplemental record in reliance on *Glazer*. *See Quinn v. Qwest Commns. Copr.*,  1:09-CV-02403-KOB (N.D. Ala. July 07, 2010) (doc. 26).  Dr. Ryder did not submit his letter until October 26, 2008, almost a year after Hartford started contacting him for his opinion regarding Ms. Brewer.  Because Hartford did not have the letter among its materials when it made its

decision or during the administrative appeal, this court should not consider it when reviewing

Hartford's decision.  The motion to STRIKE is due to be granted.

## IV.  CROSS-MOTIONS FOR SUMMARY JUDGMENT/JUDGMENT ON THE RECORD

The remaining motions before the court are "Plaintiff's Motion for Summary Judgment"

(doc. 24) and "Motion for Summary Judgment by Hartford Life and Accident Insurance

Company" (doc. 27), which, as indicated above, have been submitted to the court for judgment

on the Record, in lieu of a bench trial.  (*See* Joint Mot. for Submission on the Record, Doc. 40.)

Consequently, the court adjudicates these motions on the merits to reach a final judgment.

### STANDARD OF REVIEW

Although motions for summary judgment are normally governed by the standard under

Rule 56(a), courts have recognized that this standard is not appropriate in ERISA cases where

"the district court sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat.*

*Servs. Inc.*, 2005 WL 894840 at *7 (11th Cir. 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d

11, 17–18 (1st Cir. 2002)); *see Ruple v. Hartford Life & Accident Ins. Co.*, 340 Fed. Appx. 604,

611 (11th Cir. 2009) ("[The] typical summary judgment analysis does not apply to ERISA

cases"); *Herman v. Hartford Life & Accident Ins. Co.*, 2011 U.S. Dist. LEXIS 87818 at *3 (S.D.

Fla. Aug. 9, 2011). Here, the court granted the parties' joint motion for submission of the case for

judgment on the record.  Thus, the court does not take evidence on any unresolved factual issues,

such as whether Ms. Brewer is truly disabled, but instead evaluates whether the claims

administrator was reasonable in its decision to deny benefits.

The ERISA statute, however, does not provide a standard of review for actions brought

under § 1132(a)(1)(B) challenging benefit eligibility determinations. *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 109, 109 S. Ct. 948, 953 (1989). The Supreme Court in *Firestone*

established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de*

*novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious

where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious

where the plan grants the administrator discretion and the administrator has a conflict of interest.

*Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (discussing *Firestone Tire*

*& Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 953 (1989)).

The Eleventh Circuit further fleshed out the *Firestone* test into a six-step framework to

guide courts evaluating a plan administrator's decision. *See Williams v. Bellsouth Telecomms.*,

*Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life*

*Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008).

When the Eleventh Circuit first created the *Williams* test, the sixth step of the test

required courts reviewing a plan administrator's decision to apply a heightened arbitrary and

capricious standard if the plan administrator operated under a conflict of interest. *See id.* The

Eleventh Circuit later modified this step in response to the Supreme Court's ruling in

*Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008), making

the conflict of interest a factor in the analysis rather than having it trigger a heightened standard

arbitrary and capricious standard.  *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350,

1354–55 (11th Cir. 2011) (citing *Williams v. Bellsouth Telecomms.*, *Inc.*, 373 F.3d 1132,

1137–38 (11th Cir. 2004)).

The Eleventh Circuit's latest version of the *Williams* test provides:

(1) Apply the de novo standard to determine whether the claim administrator's

benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1354–55.

In Ms. Brewer's case, because the plan grants Hartford full discretion in reviewing claims under the plan, all steps in the *Williams* test are potentially at issue. *See Blankenship*, 644 F.3d at 1356 n.7. This court, however, finds it unnecessary to proceed beyond the first step of the *Williams* test, because it cannot say that Hartford's decision to deny Ms. Brewer's benefits was *de novo* wrong.

**DISCUSSION**

Ms. Brewer advances two primary arguments to support her claims in this case. First, she argues that Hartford erred in denying her benefits. Second, she argues that Hartford failed to conduct a "full and fair review" of her benefits claim.

*A.   De Novo Review of Ms. Brewer's Claim*

When reviewing a plan administrator's decision to deny benefits *de novo*, this court is limited to the material that was before Hartford at the time it made its decision. *See Glazer*, 524

F.3d at 1246-47. The Eleventh Circuit has also instructed district courts to apply the terms of the plan when making a determination of whether a plan administrator was "wrong" to deny benefits under the *de novo* standard. *See Peters v. Hartford Life & Accident Ins. Co.*, 367 Fed. Appx. 69, 71–72 (11th Cir. 2010) (citing 29 U.S.C. § 1104(a)(1)(D), which explains that an ERISA plan administrator must discharge its duties with respect to the plan). Ms. Brewer has the burden of proving her entitlement to these benefits. *See Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

*1.  The Terms of the plan*

Two provisions of the plan are particularly relevant to Ms. Brewer's claim for continued LTD benefits. The first is the definition of "disability." To be disabled under the plan at the time that Hartford made its decision, Ms. Brewer had to be unable to work in any job for which she was qualified, and she must not have been working for wages in any other job. But if she did work another job, she could still be disabled if her injury caused her physical or mental impairment to such a degree that she could only earn 60% or less of the pay from her job before disability. Hartford, in its brief, emphasizes that these provisions do not give Ms. Brewer eligibility for benefits simply because of her medical condition. Rather, the provisions require that in addition to having a medical condition—an undisputed fact in this case—the medical condition must be so severe that she is unable to engage in any other work that would pay 60% or less of her previous salary. *See Disanto v. Wells Fargo & Co., et al.*, 2007 U.S. Dist. LEXIS 62781 at *32 (M.D. Fla. Aug. 24, 2007) ("A diagnosis 'does not by itself establish disability.'").

The second relevant provision is the requirement that Ms. Brewer supply, at her expense, proof that she is receiving treatment from a doctor and objective medical findings that support

her disability. District courts have recognized that these provisions are reasonable, and have even implied them into long term disability policies where not explicitly stated. *See Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1355–56 (M.D. Fla. 2004) (explaining that the requirement for objective medical information is necessary to prevent fraud in long term disability plans, and that back injuries are not the type of injury that is difficult to document through objective medical evidence).

When the court evaluates Hartford's decision in light of this plan, it cannot say that Hartford was *de novo* wrong, as discussed further below.

*2. Ms. Brewer's 2004 judgment against Hartford's predecessor does not estop Hartford from denying her benefits*

Before discussing whether Hartford's decision was *de novo* wrong, this court first addresses Ms. Brewer's argument that Hartford's decision was wrong because it is somehow estopped from arguing that Ms. Brewer's condition has changed since the 2004 judgment in her favor. Ms. Brewer asserts that Hartford's decision to deny benefits was a "sudden and thinly supported departure" from the previous 2004 judgment, (P. Br., p. 15) (doc. 25), and alleges that none of Hartford's doctors had opined that Ms. Brewer's condition had changed.

This argument, in addition to misinterpreting estoppel rules, mistakenly merges the continued existence of her medical condition with her continuously meeting the requirements for disability. The 2004 opinion established that Ms. Brewer had failed back syndrome and met the definition for disability from 2001 to 2004. It was meant to award Ms. Brewer her wrongly denied benefits and reinstate her under the plan as of the date Judge Propst issued the order. It

was not meant to be used as a sword to fend off any further challenges to her LTD benefits, based on later acquired evidence that might indicate she was no longer disabled.

Ms. Brewer argues that estoppel should apply as an equitable doctrine "by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *See* Pl. Response Br. at 21 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S. Ct 1808, 1814 (2001)). Hartford counters by explaining that judicial estoppel "prevents a party from taking a position contrary to a position on which that party previously **prevailed** in the same, or prior, litigation." *Mechler v. John Hancock Life Ins. Co.*, 2008 U.S. Dist. LEXIS 75955 at *18 (S.D. Ala. Sept. 30, 2008) (emphasis added) (citing *New Hampshire v. Maine*, 532 U.S. 742 (2001)).

According to the Eleventh Circuit, judicial estoppel is an equitable doctrine invoked at this court's discretion "designed to protect the integrity of the judicial process." *See Transamerica Leasing, Inc., v. Inst. of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005). This court may apply the doctrine to prevent a party from asserting a claim in this proceeding that is inconsistent with a claim asserted in a previous proceeding. *See id.* The Eleventh Circuit has discussed two factors in deciding whether judicial estoppel applies: "first, it must be established that the allegedly inconsistent positions were made under oath in a prior proceeding; and second, the inconsistencies must have been calculated to make a mockery of the judicial system." *Id.* (citing *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)).

In light of the Eleventh Circuit's instructions on judicial estoppel, the court agrees with Hartford that judicial estoppel does not apply in this situation, primarily because Hartford's

24

decision in this case is not inconsistent with CCC's position in 2004. The 2004 lawsuit dealt with a different decision to deny benefits and was made under different evidence. Contrary to Ms. Brewer's assertions, the issue has never been whether Ms. Brewer has a medical condition, which is undisputed in this case and was undisputed in the former 2004 opinion, but whether that medical condition is so disabling that she is unable to work and thus qualifies for disability benefits *at a particular time*. CCC, Hartford's predecessor-in-interest, argued that Ms. Brewer did not meet the definition for "disabled" in 2004, an argument on which it did not prevail.

Hartford, in this case, does not dispute Judge Propst's *2004* ruling that Ms. Brewer met the definition for disability *then*, but instead asserts that at the time Hartford denied her claim *in 2008*, she no longer met the definition of eligibility. Nor does Hartford seek to protect its denial of benefits on the same evidence used in the 2004 lawsuit. Instead, it argues that the video surveillance, two independent reviews, and lack of any other objective medical evidence, show that Ms. Brewer has not proven that she remains disabled and that she cannot work a sedentary job as of January 18, 2008.

The burden remains on Ms. Brewer to show that she is entitled to benefits, notwithstanding her victory in court in 2004. Although she may use underlying evidence in her favorable 2004 judgment to show that Hartford was wrong in denying her benefits, this evidence is not determinative of her entitlement to disability benefits in the current suit. Under the plan she bears an *ongoing* responsibility of supporting her disability by objective medical findings, and under the law she bears the burden of proving her continued entitlement to the benefits. The 2004 judgment, by itself, does not show that she was disabled in 2008. The court, therefore, finds that

25

the 2004 judgment in her favor does not preclude Hartford from later denying her disabilities as of January 18, 2008.

*3. Ms. Brewer's medical records show that she is able to perform sedentary work with reasonable restrictions*

This court's review of the administrative record before Hartford shows ample evidence that Ms. Brewer no longer met the definition of "Disabled" at the time Hartford denied her benefits. Despite her burden under the law and the plan, Ms. Brewer did not provide objective medical findings that contradicted the evidence in the record that she was not disabled.

Ms. Brewer's most recent medical records

Ms. Brewer's last surgery was in September, 2002, and the Administrative Record reflects that her last x-ray was in August, 2004. According to the technician, Ms. Brewer's scans reflected "[s]atisfactory post-operative appearance." (A.R. at 476). From that point forward, the Administrative Record shows that all Ms. Brewer's medical records came from her treating physicians at the Doleys Clinic. During 2005, however, Ms. Brewer did not submit any records to Hartford.

During 2006 and 2007, the records from the Doleys Clinic indicate that Ms. Brewer's pain management treatment appeared to be working and her functionality improving. Ms. Brewer reported to Dr. Columbia that she had begun going to the movies with her family, shopping at the Summit, and enjoyed cooking. Dr. Columbia's records did not indicate that Ms. Brewer had any side effects from her medication. Dr. Ryder, who treated Ms. Brewer in 2007, reported similar results, noting that she was happy with the pain reduction she was getting from the medicine and that she experienced no side effects. In the questionnaires Ms. Brewer filled out for her visits to

Dr. Ryder, she reported participating in a pool program, cleaning, fishing, and playing with her kids, and reported that her pain was well-controlled and that, overall, she was pleased with the quality of pain management.

This court notes that Dr. Columbia submitted an Attending Physician's Statement in May, 2006 opining that Ms. Brewer was restricted for life to thirty minutes alternating of any activity. Hartford also acknowledged Dr. Columbia's statement in its January, 2008 letter denying Ms. Brewer's LTD benefits. As this court will explain below, however, Dr. Columbia's opinion, rendered in 2006, does not govern whether Ms. Brewer is disabled in 2008. Hartford's investigation and surveillance, along with the peer review by independent physicians, provided conflicting evidence upon which Hartford could reasonably rely.

The surveillance video and interview

In particular, the surveillance video, which this court has viewed, shows that Ms. Brewer's functional limitations may not be as severe as she had stated in 2006. The follow-up interview also indicated that Ms. Brewer's limitations may not be so severe as to preclude her from sedentary work. From this investigation, and a review of Ms. Brewer's records, Hartford concluded that Ms. Brewer could perform a sedentary job. But rather than merely using its own conclusion as the basis for terminating Ms. Brewer's benefits, Hartford took the extra step of obtaining a peer review of her medical records and asking, more than once, for an opinion from Ms. Brewer's own treating physician, Dr. Ryder. For reasons not reflected in the record, he never responded to these requests during the 2007–08 investigation of her case for continuing disability and the appeals process ending September of 2008.

Ms. Brewer seeks to discredit the surveillance video, relying on statements by Hartford's appeals specialist in deposition that the video "may not necessarily equate to work activity." Ms. Brewer also argues that because the video only covers two days of surveillance it does not represent Ms. Brewer's ability to work in a 40-hour work week, and that the video cannot substitute for a reliable medical test. Ms. Brewer also seeks to discredit the interview, arguing that because the interview was not signed by the investigator or Ms. Brewer, and because Hartford has a "conflict of interest," the court should give no weight to the interview and the investigator's observations.

Although a longer surveillance would produce more objective evidence and could give Hartford even more reason to deny her benefits, Ms. Brewer has presented no reason why this snapshot of her daily activity does not represent her functionality on an average day. This court also questions the wisdom of encouraging insurance companies to spend more time and money conducting surveillance to bolster their denial decisions. Furthermore, other courts, as well as this court, have upheld the use of video surveillance as objective medical evidence. *See Ray v. Sun Life & Health Ins. Co.*, 752 F. Supp. 2d 1229, 1248 (N.D. Ala. 2010) ("The surveillance report and footage provide objective evidence contradicting [the participant's] claimed physical limitations."); *Kiloh v. Hartford Life Ins. Co.*, 2005 U.S. Dist. LEXIS 18681 at *31 (M.D. Fla. Aug. 31, 2005) ("The Court has viewed the surveillance video submitted in this case . . . and considers it objective evidence that Plaintiff's physical capabilities exceeded the limitations that he described to [Hartford's] investigator . . . and to his treating physicians.").

This court also rejects Ms. Brewer's argument that the interview is not valid. Ms. Brewer provides no authority to support her statement that the interview report is invalid because neither

party signed it, and offers no evidence to contradict the contents of the investigator's report or to otherwise suggest that the report was fabricated. Also, the conflict of interest analysis does not apply here in the first step of the *Williams* test, where the court reviews Hartford's decision *de novo*; instead, it would only be relevant as a factor in determining whether Hartford acted arbitrarily or capriciously *if* this court found Hartford's decision to be *de novo* wrong. Even then, this court would not completely ignore the interview as Ms. Brewer asserts that it should.

Independent peer review

The peer reviews by Dr. Sniger and Dr. Kounang, both qualified independent physicians, further support Hartford's conclusion that Ms. Brewer can hold a sedentary job. Dr. Sniger, in his review before the denial of benefits, acknowledged that Ms. Brewer has a medical condition, but opined that she could nevertheless perform full-time work subject to restrictions. Dr. Kounang's review on appeal came to a similar conclusion; although Ms. Brewer has back injuries, she could still perform full-time work subject to restrictions. Both doctors tried to give Dr. Ryder an opportunity to discuss his opinion, and thus reduce the need for the doctors to "extrapolate" as Ms. Brewer accuses them of doing. Dr. Ryder, however, never responded to the independent physicians' requests, either.

Ms. Brewer argues that the opinions of Dr. Sniger and Dr. Kounang's opinions "are speculative and unreliable on their face and are not to be credited as expert testimony" under the Federal Rules of Evidence. This argument fails, however, because this court is not considering whether to admit the reports—which are clearly part of the Administrative Record—but instead whether the Administrative Record shows that Hartford correctly decided to deny Ms. Brewer's benefits under the *de novo* or arbitrary and capricious standards. Other district courts considering

similar arguments have summarily dismissed this reasoning. *See Hufford*, 322 F. Supp. 2d 1345, 1358–59 (M. D. Fla. 2004); *Wyatt v. AMEC Choices Benefits*, 2005 U.S. Dist. LEXIS 15734 at *18–21 (S.D. Tex. May 19, 2005).

Ms. Brewer further contends that, for a number of reasons, neither Dr. Kounang nor Dr. Sniger was qualified to offer opinions. Specifically, Ms. Brewer alleges that neither Dr. Sniger and Dr. Kounang is qualified in either orthopedic medicine or pain management medicine; that neither physician ever saw, spoke to, or treated Ms. Brewer; and that neither doctor ever made an appointment nor spoke to Ms. Brewer's treating doctors. This court disagrees with Ms. Brewer's contention that neither doctor was qualified to offer an opinion on her disability.

First, Dr. Sniger and Dr. Kounang were board certified in physical medicine and rehabilitation and in spinal injury, two specialities directly related to Ms. Brewer's medical condition. Ms. Brewer has given no reasons, beyond conclusory assertions, why their lack of certification in orthopedics and pain management make them less qualified to opine on Ms. Brewer's medical condition than their current certifications. Second, numerous cases have held that a plan administrator may appropriately rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports contradict the opinion of the treating physicians. *See Kiloh v. Hartfod Life Ins. Co.*, 2005 U.S. Dist. LEXIS 18681 at *41(citing *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla 2004)); *see also Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1356 (11th Cir. 2011) ("Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians.") (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965, 1970–72 (2003)).

Finally, Ms. Brewer's contention that neither of the independent physicians attempted to speak with her treating physician, Dr. Ryder, is, at best, a statement recklessly disregarding the multiple attempts made by Dr. Sniger and Dr. Kounang to contact Dr. Ryder that are documented in the Administrative Record. Although Ms. Brewer may not be at fault for Dr. Ryder's non-responsiveness, her lack of culpability does not excuse her counsel from making misstatements that are clearly contradicted in the Administrative Record.

Most importantly, Ms. Brewer has not produced any objective medical findings that support her disability and that contradict Hartford's determination that she could work a sedentary job. Although Ms. Brewer may not be at fault for Dr. Ryder's failure to respond, Hartford's initial denial letter in January, 2008 put Ms. Brewer on notice that her record lacked the objective medical findings necessary to support her claim for disability. The letter further informed Ms. Brewer that it had determined, through the employability analysis, that she could work sedentary jobs based on her limitations as determined by Hartford—without the benefit of Dr. Ryder's input. Ultimately, Ms. Brewer was responsible for submitting to Hartford any information or evidence that supported her position to the contrary during the appeals process.

This court emphasizes that in ERISA cases it does not resolve factual disputes. Ms. Brewer may well be disabled, but unfortunately the ERISA statute, as currently interpreted, does not allow this court to admit evidence outside the Administrative Record, nor does it allow this court to test the credibility of the evidence in the record. Instead, the statute places the burden on Ms. Brewer to show that she is entitled to benefits under the contract, which in turn requires her to submit objective medical findings or point to evidence in the Administrative Record showing that she cannot hold any other job because of her impairments. Ms. Brewer has not done so. This

court, in reviewing the Administrative Record before Hartford at the time it made its decision and in light of the plan provisions, cannot say that Hartford was *de novo* wrong.

*4.* Levinson v. Reliance Std. Life Ins. Co. *does not apply to this case*

Ms. Brewer argues that the Eleventh Circuit case of *Levinson v. Reliance Standard Life Insurance Company*, 245 F.3d 1321 (11th Cir. 2001) is analogous to her case, and that under it, she is entitled to summary judgment. In *Levinson*, an ERISA disability benefits case, the plaintiff submitted an Attending Physician's Statement explaining that the plaintiff was disabled and that his physical limitations prevented him from engaging in heavy physical work and stressful situations. The defendant separately obtained his medical records and denied his benefits, citing a lack of physical symptoms and objective medical findings. In doing so, the defendant relied on the report of a nurse in its medical records department and the opinion of a claims person. *See Levinson*, 245 F.3d at 1324. The Eleventh Circuit affirmed the district court's decision that the defendant acted arbitrarily and capriciously because the defendant had no evidence to contradict the plaintiff's physician and relied on the opinion of the nurse and claim person and not on any independent medical evidence. *See Levinson*, 245 F.3d at 1326–27.

From this case, Ms. Brewer extrapolates the principle that "a Plaintiff is entitled to disability insurance benefits when non-physician employees of the Defendant insurance company ignore the plaintiff's treating physician's diagnosis of total disability and instead, make a self-serving finding that a plaintiff is merely asymptomatic and not based upon any medical 'evidence.'" Pl. Br. at 14. Even were the court to assume Ms. Brewer's reading of the case was accurate, her case is clearly distinguishable.

Here, Hartford has not ignored the treating physician's diagnosis; instead, it made numerous attempts to contact Dr. Ryder to discuss Ms. Brewer's medical condition. And contrary to Ms. Brewer's assertion, Hartford's finding was based on at least some medical evidence, in addition to the surveillance video, in-person interview and two independent peer reviews. Ms. Brewer's case is not one where the plan administrator denied benefits solely based on the opinion of an in-house nurse and claims reviewer in direct contradiction to the treating physician's diagnosis. Accordingly, *Levinson* does not apply to Ms. Brewer's case.

*6. Ms. Brewer's Social Security Award does not dictate the outcome of Hartford's review of Ms. Brewer's claim*

Ms. Brewer also argues that this court should consider Ms. Brewer's Social Security Disability Income award ("SSDI") when reviewing Hartford's claims. Ms. Brewer alleges that Hartford received an economic benefit from the SSDI award, but did not take the SSDI opinion into account, and that Hartford is estopped from taking an inconsistent position from the Social Security finding of disability. In support of her claim, Ms. Brewer cites to a footnote in an Eleventh Circuit opinion explaining that a district court "may consider the [SSA]'s determination of disability in reviewing a plan administrator's determination of benefits." *See Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994).

In response, Hartford explains that it *did* consider Ms. Brewer's disability award and explained the significance directly to Ms. Brewer, (*see* A.R. at 62), and that Hartford's offset of Ms. Brewer's SSDI award is a matter of contract. As to the second point, Hartford explains that disability policies, like Ms. Brewer's, are intended for income replacement, and that the

integration of benefits with other sources of income furthers the purpose of income replacement

by preventing a claimant who receives multiple disability awards from receiving a windfall.

Although Ms. Brewer is correct in stating that this court *may consider* the SSA's decision

when reviewing a denial of benefits, the Eleventh Circuit has also explained that an award of

benefits by the SSA is *not dispositive* when reviewing a plan administrator's decision,

particularly given the deference afforded to the administrator's decision. *See Paramore v. Delta

Air lines*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997). This court has also explained that different

rules apply in ERISA and Social Security cases, and accordingly affirmed a plan administrator's

decision to deny benefits under *de novo* review, notwithstanding the plaintiff's favorable SSDI

award. *See Ray*, 752 F. Supp. 2d at 1247 ("In the instant case, [the plan administrator] and this

court both considered the disability determination of the [SSA]. However, this court does not

consider the [SSA]'s finding dispositive of its disability determination and does not find [the

plan administrator's] decision *de novo* wrong simply because it is contrary to the

Administration's finding.") (citing *Paramore v. Delta Air Lines*, 129 F.3d 1446, 1452 n.5 (11th

Cir. 1997)).

This court considered the SSDI award in reviewing Ms. Brewer's claim. Nevertheless,

this court does not find Hartford's decision *de novo* wrong, especially because much of the

evidence Hartford relied on to make its decision— the surveillance, in-person interviews, and

peer review physician opinions—was not available to the SSA when it rendered its decision.

*7. Summary of* de novo *review*

This court finds that Hartford's decision to deny Ms. Brewer's benefits was *de novo* right.

Ms. Brewer's medical records indicated her condition and ability to handle her pain was

improving; the surveillance and follow-up interview provided Hartford with objective evidence

that Ms. Brewer's functionality may have been inconsistent with her stated limitations; the two

independent peer reviews indicated that Ms. Brewer was capable of holding a sedentary job; and

the employability analysis determined that Ms. Brewer could work sedentary jobs in the area

such that she would no longer meet the definition of "Disabled" under the plan. Ms. Brewer's

treating physician did not respond to Hartford's numerous requests until almost a year after

Hartford initially contacted him, which was after the termination of the appeals process, and Ms.

Brewer did not otherwise provide objective medical findings that showed she was disabled under

the plan, as the plan required her to do. Given this evidence, this court agrees with Hartford's

decision to terminate Ms. Brewer's benefits.

*B. Hartford provided Ms. Brewer with a full and fair review and did not breach its fiduciary duty*

In addition to her claim under 29 U.S.C. § 1132(a)(1)(B) asserting her entitlement to

benefits, Ms. Brewer also asserts two other claims against Hartford: that Hartford breached its

fiduciary duty in handling her claim and that Hartford denied her a fair and full review.

First, as part of her breach of fiduciary duty claim, Ms. Brewer asserts that 29 U.S.C. §

1104 requires Hartford to meet the "prudent person" standard in discharging its duties for the

plan participants, and alleges that Hartford failed to meet this standard by ignoring or

disregarding the 2004 judgment and the medical evidence Ms. Brewer submitted. Ms. Brewer

also alleges that Hartford failed to meet this standard because it neither requested additional

review on appeal nor contacted Ms. Brewer's physicians. Ms. Brewer's counsel cites no authority

discussing the statute in this context, but instead relies on misstatements of the Administrative

Record. This court hopes that these misstatements—which are contradicted by Dr. Kounang's

35

independent peer review on appeal and the multiple attempts by Hartford, Dr. Sniger, and Dr. Kounang to contact Dr. Ryder—are only the result of counsel's oversight in reviewing the lengthy Administrative Record, and not intentional attempts to deceive the court.

Although Ms. Brewer did not cite the statutory provision that would allow her to bring an action against Hartford for breach of fiduciary duty, Hartford cited to 29 U.S.C. § 1132(a)(3) in its brief, and then cited authority for why Ms. Brewer's claim is foreclosed. Under § 1132(a)(3), a participant may bring an action to enjoin any act or practice that violates any provision of ERISA or the terms of the plan. The Supreme Court has labeled this provision as one of ERISA's "catchalls," stating that it acts as a safety net for violations that § 1132 does not adequately remedy elsewhere, including actions for breach of fiduciary duty. *See Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065, 1077 (1996).

In the wake of *Varity,* the Eleventh Circuit has held that while § 1132(a)(3) can provide a viable cause of action, plan participants who bring an action under § 1132(a)(1)(B) cannot also pursue equitable relief under § 1132(a)(3). *See Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084, 1089 (11th Cir. 1999), *reh'g denied*, 209 F.3d 726 (11th Cir. 2000). This court has followed the Eleventh Circuit's lead and has rejected a plaintiff's claims under § 1132(a)(3) when a viable claim existed under § 1132(a)(1)(B). *See Hackney v. Liberty Natl. Life Ins. Co.*, No. CV-06-BE-0021-S, slip op. at 5 (Bowdre, J.) (doc. 22) (N.D. Ala. Apr. 21, 2006) ("Because Plaintiff has a viable [§ 1132(a)(1)(B)] claim for benefits, he cannot maintain a [§ 1132(a)(3)] breach of fiduciary duty claim against the Defendant, regardless of the distinct relief sought."). Because Ms. Brewer expressly seeks reinstatement of her benefits, she has an adequate remedy under § 1132(a)(1)(B) and cannot bring a claim for breach of fiduciary duty under § 1132(a)(3).

Second, Ms. Brewer argues that 29 U.S.C. § 1133 and Department of Labor regulations require Hartford to conduct a full and fair review of Ms. Brewer's claims and to provide her adequate notice of the denial of her benefits, including specific reasons for the denial. According to Ms. Brewer, Hartford breached this duty by failing to inform her of the SIU's methodology and internal reports in choosing claims for proactive review[5] and by "ignoring" the 2004 judgment.

Under 29 U.S.C. § 1133, an employee welfare benefit plan must provide adequate notice to a participant whose claim has been denied, setting forth the reasons for denial in a manner calculated to be understood, and must provide a participant whose claim has been denied a full and fair review. The Department of Labor has established a set of regulations elucidating the concept of a "full and fair review." *See* 29 C.F.R. § 2560.503-1. The regulations specifically require that the notification of benefit determination set forth the following, in a manner calculated to be understood by the claimant:

> (i) The specific reason or reasons for the adverse determination;

> (ii) Reference to the specific plan provisions on which the determination is based;

> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review; . . . .

---

[5] Ms. Brewer alleges that SIU targeted her claim for "closure." Again, this argument misrepresents the Administrative Record and Ms. Macko's statements taken in deposition. Both the Administrative Record and Ms. Macko's deposition reveal that the SIU only decides what claims it will accept for investigation—nothing in the record indicates that SIU preordains these claims to be denied when it accepts them.

29 C.F.R. § 2560.503-1(g).

This court agrees with Hartford that these statutory provisions require neither the production of the SIU's methodology nor the internal report that identified Ms. Brewer's claim for proactive review. Neither the methodology nor the report were specific reasons for Hartford's denial of benefits, but instead triggered the process where Hartford collected the evidence that ultimately led it to deny Ms. Brewer's claim. Furthermore, the initial denial letter informed Ms. Brewer of the SIU's participation in the investigation of her claim and described in detail Hartford's analysis in denying her claim. That letter provided all the information ERISA regulations required.

In support of her position that Hartford's denial of benefits was not a "full and fair review" under the ERISA statute and regulations, Ms. Brewer relies on *Halpin v. W.W. Grainger*, *Inc.*, 962 F.2d 685 (7th Cir. 1992). In *Halpin*, the Seventh Circuit held that a plan administrator's communications with the plaintiff did not comply with the regulations. *See* 962 F.2d at 691. The Seventh Circuit in *Halpin* clarified that substantial compliance with the regulations would be sufficient, *see id.* at 693–94, but ultimately held that the administrator never adequately identified the items it considered and gave no indication as to its assessment of those items or the weight given to them. *See id.* at 694. According to the Seventh Circuit, these requirements "insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." *See id.* at 689.

The Eleventh Circuit has not yet considered what a plan administrator must do to meet the ERISA regulations in as great of detail as *Halpin*; however, district courts considering this argument have emphasized that only substantial compliance with the regulations is necessary.

38

*See, e.g.*, *DeLorenzo v. Hartford Life & Accident Ins. Co.*, 2006 U.S. Dist. LEXIS 7545 at *27 (M.D. Fla. Feb. 27, 2006) ("A notice which 'substantially complies' with the requirements is sufficient."). In determining whether the notice substantial complies, the question is whether Hartford's notice of the denial of benefits provided enough information to enable Ms. Brewer to understand the Hartford's decision so that she could effectively appeal. *See id*. Under § 2560.503-1(g)(iii), Hartford does not have to tell Ms. Brewer what information she needs to submit to "win" on appeal to substantially comply with the ERISA statute and regulations; instead, Hartford substantially complies when it provides enough information so that a reasonable person can understand what additional materials she needs for the appeals process to be effective. *See Bojorquez v. E.F. Johnson Co.*, 315 F. Supp. 2d 1368, 1373 (S.D. Fla. 2004) (citing *Terry v. Bayer Corp.*, 145 F.3d 28, 32 (1st Cir. 1998).

In Ms. Brewer's case, Hartford sent her a five page single spaced letter that listed in detail the reasons why Hartford denied her claim, including the portions of the LTD policy defining disability; Ms. Brewer's medical records; Ms. Brewer's July 6, 2006 Claimant questionnaire; Dr. Columbia's May 10, 2006, Attending Physician Statement; the video surveillance and follow-up interview; Dr. Sniger's independent review; an in-house claim review by a Hartford Medical Case Manager in 2007; and the employability analysis. Hartford explained how each of these items contributed to its decision to deny Ms. Brewer's LTD benefits, emphasizing that "[b]ased on all of the information received to date, [Ms. Brewer] no longer [met] the definition of Disability as defined by the Long Term Disability policy . . . ." Hartford also emphasized its numerous attempts, and Dr. Sniger's attempts, to contact Dr. Ryder, saying:

> Dr. Ryder was advised that, based on the totality of the medical evidence and other information offered and obtained, it was our assessment that your overall functional capabilities were at least equal to that, which are required of you to perform in a full-time sedentary to light unskilled and skilled capacity. Dr. Ryder was advised that if he did not agree with this assessment, then he should provide restrictions and/or limitations with medical rationale as to why such restrictions and/or limitations were supported.
>
> We did not receive a response from Dr. Ryder . . . .

The letter also explained how Ms. Brewer could initiate the review process and notified her that she could submit written comments, documents, records and other information related to her claim.

The only item that this court notes is missing from Hartford's denial letter is any reference to the "objective medical findings" that Hartford now repeatedly emphasizes Ms. Brewer did not produce either before or during the appeals process. Because Hartford has relied so heavily on this provision in justifying its denial of Ms. Brewer's benefits before this court, the letter would have better met the requirement that it provide "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary," 29 C.F.R. § 2560.503-1(g)(iii), had it mentioned the role her lack of objective medical findings played in Hartford's decision to deny her benefits.

Nevertheless, Hartford's denial letter is a far cry from the plan administrator's scant notification in *Halpin*. *See Halpin*, 962 F.2d at 690–91 (quoting portions of the terse initial denial letter and discussing how it failed to meet the regulatory requirements). Although the court in *Halpin* initially appears to base its holding on a justifiable reading of the regulatory requirements—that if additional medical evidence of total disability was necessary to find a participant disabled, the letter should state so—the court ultimately based its holding on the plan

40

administrator's failure to substantially comply with the requirements by not giving the participant adequate notice of why his benefits were denied. *See id.* at 693–94 ("[W]e note that the regulations require that the denial letter itself contain specific reasons . . . . In the present case, several letters, as well as the file of material submitted by [the plan administrator]'s vocational experts, were sent to [the participant]. However, nothing was sent which in any adequate way identified the items considered by the administrator. There was no indication of the administrator's assessment of any of those items or of the weight given to them."). Hartford's letter clearly is more substantive than the letter referred to in *Halpin*.

Moreover, *Halpin* is a Seventh Circuit case and not binding precedent. The Eleventh Circuit has not yet commented on these regulations to the extent that the Seventh Circuit has, but other district courts in the Eleventh Circuit have only required substantial compliance and have not strictly construed the requirement to describe additional information necessary to perfect the claim. *See Bojorquez*, 315 F. Supp. 2d at 1373 (explaining that a plan administrator does not have to tell a participant what he will need to submit to "win," but must simply provide enough information so that the participant understands what additional materials to provide for the appeals process to be effective). Here, Hartford provided enough information in its letter for Ms. Brewer to understand the reasons why her benefits were denied, and thus to understand what additional materials she needed to submit. Accordingly, this court finds that Hartford offered Ms. Brewer a full and fair review.

*B. Ms. Brewer's conflict of interest argument does not apply*

This court finds that Hartford's decision to deny Ms. Brewer's benefits was not wrong under a *de novo* review. Accordingly, the court's analysis ends at the first step of the *William's*

analysis and need not go any further. But because Ms. Brewer has so emphasized Hartford's conflict of interest in her briefs, this court will, for the sake of argument, address the conflict of interest and its effect on this court's review of Hartford's decision.

Ms. Brewer contends that when a conflict of interest exists, as it does here where a plan administrator makes decisions on benefits while it pays benefits out of its own assets, then the proper deference to give the defendant's claim decision "should be slight or even zero." *See* Pl. Br. at 12. To support this proposition, Ms. Brewer cites to a case that was twenty years old at the time she submitted her brief, *Brown v. Blue Cross Blue Shield*, 898 F.2d 1556, 1564 (11th Cir. 1990).

Much has changed in ERISA law over the intervening twenty years, particularly in the context of conflicts of interests where courts have struggled to determine how much relevance these conflicts should have in reviewing a plan administrator's decision. The Eleventh Circuit's most recent published opinion on this issue, *Blankenship v. Metropolitan Life Insurance Company*, 644 F.3d 1350 (11th Cir. 2011), has distanced itself considerably from the stance in *Brown*, emphasizing that a structural conflict is "an unremarkable fact in the marketplace" and should only be considered as a factor in deciding whether the plan administrator's decision was arbitrary and capricious. *See id. at* 1355–56.

Admittedly, the Eleventh Circuit had not issued *Blankenship* opinion when the parties initially submitted their motions for Summary Judgment. At the time Ms. Brewer submitted her motion for summary judgment, however, the Supreme Court had already issued *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008), and the Eleventh Circuit had already responded by overruling its previous law on conflicts of interest in *Doyle v.*

*Liberty Life Assurance Company of Boston*, 542 F.3d 1352 (11th Cir 2008). *Doyle*, which Ms. Brewer does not cite in her brief supporting her motion for summary judgment, but only in her brief opposing Hartford's motion, *see* Pl. Opp. Br. at 24, expressly overruled much of the law that Ms. Brewer includes in the same brief. Such argument based on overruled law lacks merit.

Ms. Brewer has not argued how the conflict of interest affected Hartford's analysis of Ms. Brewer's claim, beyond simply stating that one exists and that Hartford is, therefore, entitled to "slight or zero deference." Although this court need not consider the conflict as a factor in its review because it has determined Hartford's decision was *de novo* right, if this court were to analyze whether Hartford's decision was arbitrary or capricious, it sees nothing in the record that would influence its analysis in light of the most recent Eleventh Circuit law on this issue.

As with the misstatements of facts above, the court does not appreciate Ms. Brewer's counsel's misstatements on the current state of the law. This court hopes that Ms. Brewer's counsel will better fulfill his duty of zealous advocacy for his clients in the future by avoiding these significant errors in the courts in which he appears.

**CONCLUSION**

For the reasons stated above the court will GRANT Hartford's motion to strike and

motion for summary judgment, converted a motion for judgment on the record and DENY Ms.

Brewer's motion for summary judgment, also converted to a motion for judgment on the record.

The court will simultaneously enter an order to that effect.

DONE and ORDERED this 30th day of September, 2011.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE